54

FILED
July 03, 2012
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0004322846

Zack A. Clement (*pro hac vice* pending)
William R. Greendyke (*pro hac vice* pending)
R. Andrew Black (*pro hac vice* pending)
**Fulbright & Jaworski L.L.P.**
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone:    (713) 651-5151
Facsimile:    (713) 651-5246
zclement@fulbright.com
wgreendyke@fulbright.com
ablack@fulbright.com

Kenneth N. Klee (SBN 63372)
Michael L. Tuchin (SBN 150375)
**KLEE, TUCHIN, BOGDANOFF & STERN LLP**
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA  90067-6049
Telephone:    (310) 407-4000
Facsimile:    (310) 407-9090
kklee@ktbslaw.com
mtuchin@ktbslaw.com

Attorneys for Debtor
TOWN OF MAMMOTH LAKES, CALIFORNIA

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| IN RE:<br><br>TOWN OF MAMMOTH LAKES, CALIFORNIA,<br><br>　　　　　DEBTOR. | Case No. 2012-32463<br><br>DC. No. FJ-3<br><br>Chapter 9<br><br>**DISCLOSURE STATEMENT WITH RESPECT TO PLAN FOR THE ADJUSTMENT OF DEBTS OF TOWN OF MAMMOTH LAKES, CALIFORNIA, DATED JULY 3, 2012**<br><br>Date:　　TBA<br>Time:　　TBA<br>Place:　　Robert Matsui U.S. Courthouse<br>　　　　　Dept. __, Courtroom __<br>　　　　　501 I Street, Sacramento, CA 95814 |

DOCUMENT PREPARED
ON RECYCLED PAPER

77691845.6

**Page**

## **Table of Contents**

SUMMARY ................................................................................................................... 1

I.    INTRODUCTION ................................................................................................. 5

    A.    The Purpose of This Disclosure Statement. ............................................... 6

    B.    Summary of Entities Entitled to Vote on the Plan and of Certain
        Requirements Necessary for Confirmation of the Plan............................... 7

    C.    Voting Procedures, Balloting Deadline, Confirmation Hearing, and Other
        Important Dates, Deadlines, and Procedures. ............................................ 8

        1.    Voting Procedures and Deadlines. ................................................. 8

        2.    Date of the Confirmation Hearing and Deadlines for Objection to
            Confirmation of the Plan. ............................................................... 8

    D.    Important Notices and Cautionary Statements. .......................................... 9

    E.    Additional Information. ............................................................................ 10

II.   BACKGROUND INFORMATION ..................................................................... 10

    A.    The Town ................................................................................................. 10

    B.    Overview of the Town's Finances ........................................................... 11

    C.    The Town's Financial Problems ............................................................... 13

    D.    The MMLA Judgment and Mandate Proceeding....................................... 14

    E.    The Neutral Evaluation Process .............................................................. 16

    F.    The Filing of Bankruptcy ........................................................................ 17

III.  ADMINISTRATION OF THE TOWN'S CHAPTER 9 CASE .............................. 18

    A.    Budget Reduction Plan............................................................................. 18

    B.    Entry of Order for Relief ......................................................................... 18

IV.   THE TOWN'S LIABILITIES AND ASSETS ...................................................... 18

    A.    Liabilities. ............................................................................................... 19

        1.    Liabilities Listed by the Town in its Filings on the Petition Date. ........... 19

        2.    Proofs of Claim. ........................................................................... 19

        3.    Class 6 Claims .............................................................................. 20

        4.    Claims Relating to the COPs Documents ...................................... 20

        5.    Statement Regarding Liabilities.................................................... 21

    B.    Assets. ..................................................................................................... 22

DOCUMENT PREPARED
ON RECYCLED PAPER

**TABLE OF CONTENTS**
(continued)

Page

1. Capital Assets and Discretionary Assets. ........................................... 22

2. Claims and Causes of Action Against Third Parties. .......................... 24

V. SUMMARY OF THE PLAN OF ADJUSTMENT .......................................... 25

  A. Classification and Treatment of Claims. .......................................... 26

    1. Unclassified Claims. ................................................................ 26

    2. Class 1 (Union Bank COP Obligations). ............................... 28

    3. Class 2 (Citizens Bank (Police Facility) COP Obligations) .... 28

    4. Class 3 (Citizens Bank (Mammoth Lakes Housing Corporation Land Acquisition Project) COP Obligations). ........................... 29

    5. Class 4 (Employee Pre-Petition Leave Claims) ..................... 29

    6. Class 5 (Convenience Class Claims) ...................................... 30

    7. Class 6 (General Unsecured Claims Not Otherwise Classified). .............. 30

    8. Class 7 (Claims of CJPIA for General Liability Coverage Obligations). ........................................................................... 31

    9. Class 8 (Claims of CJPIA for Workers' Compensation Insurance). ......... 31

    10. Class 9 (Claims of CalPERS with Respect to the CalPERS Pension Plan, as Trustee Under the CalPERS Pension Plan for the Benefit of CalPERS Pension Plan Participants). ................................. 32

    11. Class 10 (Special Assessment and Special Tax Obligations). ................. 32

  B. Treatment of Executory Contracts and Unexpired Leases. ................. 32

    1. Generally. ................................................................................ 32

    2. Assumption. ............................................................................. 33

    3. Rejection. ................................................................................. 34

    4. Deadline for the Assertion of Rejection Damage Claims; Treatment of Rejection Damage Claims. ...................................... 34

  C. Means for Execution and Implementation of the Plan. ........................ 34

  D. Distributions. ................................................................................... 36

    1. Undeliverable Distributions. ................................................... 36

    2. Timeliness of Payments. ......................................................... 37

    3. Compliance With Tax, Withholding and Reporting Requirements. ......... 37

    4. Time Bar to Cash Payments. ................................................... 37

    5. No De Minimis Distributions. ................................................. 38

DOCUMENT PREPARED
ON RECYCLED PAPER

# TABLE OF CONTENTS
(continued)

|   | 6. | No Distributions on Account of Disputed Claims. | 38 |
|---|---|---|---|
|   | 7. | No Postpetition Accrual of Interest. | 38 |
| E. | Disputed Claims. | | 38 |
|   | 1. | Claims Objection Deadline; Prosecution of Objections. | 38 |
|   | 2. | Reserves, Payments, and Distributions With Respect to Disputed Claims. | 38 |
| F. | Continuing Jurisdiction of the Bankruptcy Court. | | 39 |
| VI. | CONFIRMATION AND EFFECTIVENESS OF THE PLAN | | 39 |
| A. | Voting and Right to Be Heard at Confirmation. | | 40 |
|   | 1. | Who May Support or Object to Confirmation of the Plan? | 40 |
|   | 2. | Who May Vote to Accept or Reject the Plan? | 40 |
|   | 3. | Who Is Not Entitled to Vote? | 40 |
|   | 4. | Vote Necessary to Confirm the Plan. | 41 |
| B. | The "Best Interests" Test. | | 41 |
| C. | Feasibility. | | 41 |
| D. | Cram Down. | | 42 |
| E. | Effective Date. | | 43 |
|   | 1. | Conditions to the Occurrence of the Effective Date. | 43 |
|   | 2. | Non-Occurrence of Effective Date. | 43 |
| F. | Effect of Confirmation. | | 44 |
|   | 1. | Discharge of the Town. | 44 |
|   | 2. | Exculpation | 44 |
|   | 3. | Binding Effect | 45 |
|   | 4. | Injunction | 45 |
|   | 5. | Term of Existing Injunctions and Stays. | 46 |
| VII. | CERTAIN RISK FACTORS TO BE CONSIDERED | | 46 |
| VIII. | CERTAIN FEDERAL INCOME TAX CONSEQUENCES | | 46 |
| IX. | RECOMMENDATION AND CONCLUSION | | 48 |
| EXHIBITS TO DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN FOR THE ADJUSTMENT OF DEBTS OF TOWN OF MAMMOTH LAKES, CALIFORNIA. | | | 49 |

DOCUMENT PREPARED ON RECYCLED PAPER

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTE:  The Bankruptcy Court Has Not Yet Approved This Disclosure Statement Pursuant To Section 1125(b) Of The Bankruptcy Code For Use In The Solicitation Of The Plan Of Adjustment Of Debts Described Herein.  The Filing And Distribution Of This Disclosure Statement Therefore Is Not Intended As, And Should Not Be Construed To Be, A Solicitation Of Acceptance Or Rejection Of That Plan Or Any Other Plan.**

## SUMMARY

The following pages summarize certain important information set forth elsewhere in this Disclosure Statement. Capitalized terms are defined in the text of this Disclosure Statement and in the Plan, and any Capitalized term used but not defined in the Disclosure Statement shall have the meaning ascribed to it in the Plan.

The Disclosure Statement contains important information that is not summarized in this Summary and that may influence your decision regarding whether to accept or reject the Plan or otherwise affect your rights. Please do not rely on this Summary standing alone, and please read all of this document and the accompanying materials thoroughly.

The "Plan For The Adjustment Of Debts Of Town Of Mammoth Lakes, California, Dated July 3, 2012" (the "Plan") proposed by the Town Of Mammoth Lakes, California (the "Town" or "Mammoth Lakes"), involves the restructuring or discharge of (i) approximately $3.3 million of publicly-held and privately-held financing obligations; (ii) obligations to current employees; (iii) claims of the California Joint Powers Insurance Authority, through which the Town obtains its general liability, real property and workers' compensation coverage, for over $1.4 million owed for retroactive adjustment payment calculations relating to retroactive adjustment payment calculations relating to pre-Petition Date periods; (iv) the unsecured judgment in favor of Mammoth Lakes Land Acquisition, LLC ("MLLA") in the amount of $42,746,754.70 as of April 30, 2012; (v) claims arising from tort and breach of contract lawsuits against the Town; and (vi) various other unsecured claims, including approximately $600,000 in debt owed to state agencies for capital improvement loans and claims arising from the rejection of executory contracts. Importantly, the Plan does not impair the Town's obligations to either CalPERS in its capacity as trustee for the pension trusts nor the Town's retired workers and their dependents who are the beneficiaries of such trusts. Accordingly, pension payments to such persons will not be altered by the Plan.

Holders of Allowed general unsecured Claims not otherwise classified under the Plan (Class 6 Claims) - which includes MLLA (on account of a final judgment against the Town that, including interest and attorneys' fees, is in excess of $43 million) – will, on the Effective Date of

the Plan, be given beneficial interests in the Mammoth Lakes Plan of Adjustment Trust (the "Trust") created pursuant to the Plan in proportion to their pro rata share of the total Allowed Class 6 Claims.  The Trust will be administered by the Plan Trustee and will be funded by Trust Assets contributed to the Trust by the Town consisting of the Contributed Real Estate, the Initial Cash Contribution and the Annual Cash Contribution and/or the Plan COP/Bond.  The amounts available for distribution to Allowed Class 6 Claims from the Trust will be approximately $5.8 million in total in cash payments from the General Fund over the next ten years (or the net proceeds of a Plan COP/Bond supported by such payments) and the net proceeds of the sale of the Contributed Real Estate, estimated to be approximately $250,000.  The estimated payment to holders of Class 6 Claims, is approximately 5% to 12% of their claims amount.  While the Town regrets that it cannot pay a higher percentage to holders of Allowed Class 6 Claims, the fact is that the Town lacks the revenues to do so while maintaining an adequate level of municipal services such as the provision of police protection, the repairing of the Town's streets and support for the essential functions of a tourism-based resort community.

The Plan does not alter the obligations of those Town funds that are restricted by grants, by federal law and by California law; pursuant to the Tenth Amendment to the United States Constitution and the provisions of the Bankruptcy Code that implement the Tenth Amendment, such funds cannot be impacted in the Bankruptcy Case.  Thus, securities funded by restricted funds, such as the Special Assessment and Special Tax Obligations secured by special revenues of the Town's restricted funds, are not altered by the Plan.

The following chart summarizes key information, including the proposed treatment of the various classes of claims:

| **Debtor** | Town of Mammoth Lakes, California |
|---|---|
| **Bankruptcy Court** | United States Bankruptcy Court for the Eastern District of California, Sacramento Division, The Honorable [_____] presiding. |
| **Plan** | Plan For The Adjustment Of Debts Of Town of Mammoth Lakes, California, Dated July 3, 2012. |

DOCUMENT PREPARED ON RECYCLED PAPER

| | |
|---|---|
| **Purpose of the Disclosure Statement** | To provide information of a kind, and in sufficient detail, that would enable a typical holder of claims in a class impaired under the Plan to make an informed judgment with respect to voting on the Plan. |
| **Balloting Information** | Ballots have been provided with this Disclosure Statement to creditors known to have claims that are impaired under the Plan.  Ballots must be returned to and received by the Ballot Tabulator by no later than 4:30 p.m., Pacific Time, on [_____], 2012. . |
| **Ballot Tabulator** | [_____]. |
| **Confirmation Hearing and Confirmation Objections** | A hearing regarding confirmation of the Plan will be held by the Bankruptcy Court on [_____], 2012, commencing at __:00 a.m., Pacific Time. Objections to confirmation also must be filed and served by no later than [_____], 2012 |
| **Treatment of Claims** | If the Court confirms the Plan and the Plan becomes effective, claims will be treated as follows: |
| Administrative Claims | Paid in full, except to the extent that the holder of an Administrative Claim agrees to different treatment. |
| **Class 1** <br><br> Union Bank COP Obligations | Unimpaired. |
| **Class 2** <br><br> Citizens Bank (Police Facility) COP Obligations | Impaired.   The Citizens Bank (Police Facility) COP Obligations and the supporting documents will be amended and restated to extend the term of the underlying payment obligation by three years.  Citizens Bank, the holder of the Citizens Bank (Police Facility) COP Obligations, will receive the amended and restructured payments through year 2017. |
| **Class 3** <br><br> Citizens Bank (Mammoth Lakes Housing Corporation Land Acquisition Project) COP Obligations | Impaired.   The Citizens Bank (Mammoth Lakes Housing Corporation Land Acquisition Project) COP Obligations and the supporting documents will be amended and restated to extend the term of the underlying payment obligation by three years.   Citizens Bank, the holder of the Citizens Bank (Mammoth Lakes Housing Corporation Land Acquisition Project) COP Obligations, will receive the amended and restructured payments through year 2017. |

77691845.6

- 3 -

| **Class 4** | Impaired. The number of hours of comprehensive and sick leave accrued and earned by each employee but unpaid as of July 1, 2012 (i.e., hours in each employee's "Employee Pre-Petition Leave Bank"), will be reduced by 10%. |
| **Employee Pre-Petition Leave Claims** | During their continued employment with the Town, employees will not be permitted to cash out any hours in their Employee Pre-Petition Leave Bank. |
| | Upon voluntary termination of employment: (a) an employee will receive a cash payment representing 50% of the hours of his or her accrued and unpaid leave, including the Employee Pre-Petition Leave Bank hours, at their full rate of pay at the time of employment separation; and (b) the value of remaining 50% in his or her accrued and unpaid leave, including the Employee Pre-Petition Leave Bank hours, shall be paid in 12 equal monthly payments at each employee's full rate of pay. Upon involuntary termination of employment, an employee will receive a cash payment representing 100% of the hours of his or her accrued and unpaid leave, including the Employee Pre-Petition Leave Bank hours, at their full rate of pay at the time of employment separation; |
| **Class 5** | Impaired. Class 5 consists of holders of general unsecured claims in an allowed amount of less than $10,000 or who elect to reduce their claim to be treated as a Convenience Class Claim. Class 5 claims will receive one cash payment from the General Fund on the later of the Effective Date of the Plan or the allowance of the claim, in a amount equal to 10% of the allowed amount of the claim. Class 5 claims will not be beneficiaries of the Trust or participate in any distributions from the Class 6 Claims Fund. |
| **Convenience Class Claims** | |
| **Class 6** | Impaired. Holders of Allowed Class 6 Claims will be given beneficial interests in the Trust and share *pro rata* in distributions from the Class 6 Claims Fund administered by the Trust. The estimated range of payments for all holders of Allowed Class 6 Claims is 5% to 12%. |
| **General Unsecured Claims Not Otherwise Classified** | |
| **Class 7** | Impaired. The Town owes CJPIA $861,657 in retrospective adjustment payments for general liability insurance for the coverage periods through 2010-2011. Under the governing documents of the CJPIA the Town is required to pay this amount over 6 years. Pursuant to the Plan, the Town will pay these pre-petition claims over 10 years. |
| **Claims of CJPIA for General Liability Coverage Obligations** | |
| **Class 8** | Impaired. The Town owes CJPIA $557,179 in retrospective adjustment payments for workers' compensation coverage for the coverage periods through 2010-2011. Under the governing documents of the CJPIA the Town is required to pay this amount over 6 years. Pursuant to the Plan, the Town will pay these pre-petition claims over 10 years. |
| **Claims of CJPIA for Workers Compensation Coverage Obligations** | |

DOCUMENT PREPARED
ON RECYCLED PAPER

| | |
|---|---|
| **Class 9** | Unimpaired. |
| CalPERS on account of the CalPERS Retirement Plan | |
| **Class 10** | Unimpaired.  The Class is included in the Plan solely in order to clarify that the Special Assessment and Special Tax Obligations are not obligations of the Town's General Fund. The revenue collected to fund the Special Assessment and Special Tax Obligations making up this class is legally restricted to the payment of debt service on the special assessment and special tax obligations.  These revenues are "special revenues" as defined in section 902(2) of the Bankruptcy Code and cannot be used for any other purpose or be transferred to the General Fund.  The General Fund is not obligated to pay debt service on the special assessment and special tax obligations. The Town will continue to apply revenues from the applicable special assessments and special taxes to pay the Special Assessment and Special Tax Obligations as required by the terms of such obligations. |
| Special Assessment and Special Tax Obligations | |
| **Background Information:** | See pages 10 to 18. |
| **Questions:** | Contact the Town's counsel, Zack A. Clement (contact information on the first page of this document) |

To the extent that there is any inconsistency between the Plan (including the Exhibits and any supplements to the Plan) and the description in the Disclosure Statement, the terms of the Plan (including the Exhibits to the Plan) will govern.

## I.    INTRODUCTION

The Town filed a petition under chapter 9 of title 11 of the United States Code (the "Bankruptcy Code")[1] on July 3, 2012 (the "Petition Date"), which was designated Case Number 2012-32463 (the "Chapter 9 Case").  An order for relief was entered on [_____], 2012 and the Chapter 9 Case is currently pending before the United States Bankruptcy Court for the Eastern District of California, Sacramento Division (the "Bankruptcy Court").

The Town is the proponent of the Plan, a copy of which is attached to this Disclosure Statement as Exhibit A.  At a hearing held on [_____], 2012, the Bankruptcy Court determined that this Disclosure Statement contains "adequate information" within the meaning of

---

[1] 11 U.S.C. § 101, *et seq.*

DOCUMENT PREPARED ON RECYCLED PAPER

section 1125 of the Bankruptcy Code and authorized the Town to transmit it to holders of impaired claims in connection with the solicitation of votes with respect to the Plan.

As described more fully elsewhere in this document, the Town believes that the Plan provides the greatest and earliest possible recoveries to holders of claims, that acceptance of the Plan is in the best interests of all parties, and that any alternative restructuring or reorganization would result in delay, uncertainty, expense, litigation and, ultimately, smaller or no distributions to creditors.  Accordingly, **the Town urges that you cast your ballot in favor of the Plan.**

### A.    The Purpose of This Disclosure Statement.

The Bankruptcy Code generally requires that the proponent of a plan of adjustment prepare and file with the applicable bankruptcy court a "disclosure statement" that provides information of a kind, and in sufficient detail, that would enable a typical holder of claims in a class impaired under that plan to make an informed judgment with respect to the plan.  This Disclosure Statement provides such information.  ***Parties in interest should read this Disclosure Statement, the Plan, and all of the exhibits accompanying such documents in their entirety in order to ascertain:***

1.    How the Plan will affect their claims against the Town;

2.    Their rights with respect to voting for or against the Plan;

3.    Their rights with respect to objecting to confirmation of the Plan; and

4.    How and when to cast a ballot with respect to the Plan.

This Disclosure Statement, however, cannot and does not provide creditors with legal or other advice or inform such parties of all aspects of their rights.  Claimants are advised to consult with their attorneys and/or financial advisors to obtain more specific advice regarding how the Plan will affect them and regarding their best course of action with respect to the Plan.

This Disclosure Statement has been prepared in good faith and in compliance with applicable provisions of the Bankruptcy Code.  Based upon information currently available, the Town believes that the information contained in this Disclosure Statement is correct as of the date of its filing.  The Disclosure Statement, however, does not and will not reflect some events that

occur after [_____], 2012 (and, where indicated, specified earlier dates), and the Town assumes no duty and presently does not intend to prepare or distribute any amendments or supplements to reflect such events.

**B.    Summary of Entities Entitled to Vote on the Plan and of Certain Requirements Necessary for Confirmation of the Plan.**

Holders of Allowed Claims in the following Classes are entitled to vote on the Plan because the Claims in each such Class are "impaired" under the Plan within the meaning of Section 1124 of the Bankruptcy Code: Class 2 (Citizens Bank (Police Facility) COP Obligations), Class 3 (Citizens Bank (Mammoth Lakes Housing Corporation Land Acquisition Project) COP Obligations), Class 4 (Employee Pre-Petition Leave Claims), Class 5 (Convenience Class Claims), Class 6 (General Unsecured Claims Not Otherwise Classified), Class 7 (Claims of CJPIA for General Liability Coverage Obligations), and Class 8 (Claims of CJPIA for Workers' Compensation Coverage Obligations).

The Bankruptcy Court may confirm the Plan only if at least one Class of impaired claims has voted to accept the Plan (without counting the votes of any insiders whose claims are classified within that Class) and if certain statutory requirements are met as to both non-consenting members within a consenting Class and as to any dissenting Classes.  A Class of claims has accepted the Plan only when at least more than one-half in number and at least two-thirds in amount of the Allowed Claims actually voting in that Class vote in favor of the Plan.

In the event of a rejection of the Plan by any of the voting Classes, the Town will request that the Bankruptcy Court confirm the Plan in accordance with those portions of section 1129(b) of the Bankruptcy Code that are applicable to the Chapter 9 Case, which provisions permit confirmation by a process known as "cram down" notwithstanding such rejection if the Bankruptcy Court finds, among other things, that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each rejecting Class.  Other sections of this Disclosure Statement provide a more detailed description of the requirements for acceptance and confirmation of the Plan.

Document Prepared
on Recycled Paper

C.    **Voting Procedures, Balloting Deadline, Confirmation Hearing, and Other Important Dates, Deadlines, and Procedures.**

1.    **Voting Procedures and Deadlines.**

The Town has provided copies of this Disclosure Statement and ballots to all known holders of impaired claims in the Voting Classes.  Those holders of an Allowed Claim in each of the Voting Classes who seek to vote to accept or reject the Plan <u>must</u> complete a ballot and return it to the Court-appointed ballot tabulator – [_____] (the "<u>Ballot Tabulator</u>") - so that their ballots actually are received by no later than the Balloting Deadline (defined below).  Ballots do not constitute proofs of claim and must be returned directly to the Ballot Tabulator, **not** to the Bankruptcy Court.

*All ballots, including ballots transmitted by facsimile, must be completed, signed, returned to, and actually received by the Ballot Tabulator by not later than [_____], 2012, at 4:30 p.m. Pacific Time (the "Balloting Deadline").  Neither Ballots received after the Balloting Deadline, nor ballots returned directly to the Bankruptcy Court rather than to the Ballot Tabulator, shall be counted in connection with confirmation of the Plan.*

2.    **Date of the Confirmation Hearing and Deadlines for Objection to Confirmation of the Plan.**

The hearing to determine whether the Bankruptcy Court will confirm the Plan (the "Confirmation Hearing") will commence on [_____], 2012, at [_____].m. Pacific Time in the Courtroom of the Honorable [_____], United States Bankruptcy Judge for the Eastern District of California, in the Courtroom on the 7th floor of the United States Courthouse, 501 I Street, Sacramento, California 95814.  The Confirmation Hearing may be continued from time to time, including by announcement in open court, without further notice.

Any objections to confirmation of the Plan must be filed with the Bankruptcy Court and served on the following entities so as to be <u>actually received</u> by no later than [_____], 2012: (a) Zack A Clement, Fulbright & Jaworski LLP, 1301 McKinney, Suite 5100, Houston, TX 77010-3095 (counsel to the Town) and (b), Kenneth N. Klee, Klee, Tuchin, Bogdanoff & Stern LLP, 1999 Avenue of the Stars, 39th Floor, Los Angeles, CA  90067-6049 (counsel to the Town). Objections that are not timely filed and served <u>may not be considered</u> by the Bankruptcy Court.

DOCUMENT PREPARED ON RECYCLED PAPER

*Please refer to the accompanying notice of the Confirmation Hearing for specific requirements regarding the form and nature of objections to confirmation of the Plan.*

**D.      Important Notices and Cautionary Statements.**

The historical financial data relied upon in preparing the Plan and this Disclosure Statement is based upon the Town's books and records.  Although certain professional advisors of the Town assisted in the preparation of this Disclosure Statement, in doing so such professionals relied upon factual information and assumptions regarding financial, business, and accounting data provided by the Town and third parties, much of which has not been audited.  The Town's most recent audited financial statements (the "Financial Statements"), which cover the fiscal year ended June 30, 2011, is voluminous, and is not attached hereto.  However, it is available on the Town's website or upon a written request.[2]

*The professional advisors of the Town have not independently verified such information and, accordingly,* make *no representations or warranties as to its accuracy.*  Moreover, although reasonable efforts have been made to provide accurate information, the Town does not warrant or represent that the information in this Disclosure Statement, including any and all financial information and projections, is without inaccuracy or omissions, or that actual values or distributions will comport with the estimates set forth herein.

*No entity may rely upon the Plan or this Disclosure Statement or any of the accompanying exhibits for any purpose other than to determine whether to vote in favor of or against the Plan; provided, however, that the Plan will be a legally enforceable document if it is effectuated*.  Nothing contained in such documents constitutes an admission of any fact or liability by any party, and no such information will be admissible in any proceeding involving the Town or any other party, nor will this Disclosure Statement be deemed evidence of the tax or other legal effects of the Plan on holders of claims in the Chapter 9 Case.

---

[2]      A printed copy of the Financial Statements will be mailed to you upon your request mailed to the following address: Town of Mammoth Lakes, Attn: _____, P.O. Box _____, _____, Town of Mammoth Lakes, California .

DOCUMENT PREPARED
ON RECYCLED PAPER

Certain information included in this Disclosure Statement and its Exhibits contains forward-looking statements. The words "believe", "expect", "anticipate" and similar expressions identify such forward-looking statements. The forward-looking statements are based upon information available when such statements are made, and are subject to risks and uncertainties that could cause actual results to differ materially from those expressed in the statements. A number of those risks and uncertainties are described below. Readers therefore are cautioned not to place undue reliance on the forward-looking statements in this Disclosure Statement. The Town undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

Neither the Securities and Exchange Commission nor any other regulatory agency has approved or disapproved this Disclosure Statement. Nor has any such agency determined whether this Disclosure Statement is accurate, truthful or complete.

### E.    Additional Information.

If you have any questions about the procedures for voting on the Plan, desire another copy of a ballot, or seek further information about the timing and deadlines with respect to confirmation of the Plan, please write to counsel for the Town as follows: Zack A Clement, Fulbright & Jaworski LLP, 1301 McKinney, Suite 5100, Houston, TX 77010-3095 (facsimile: 9713-6515246, email: zclement@fulbright.com). Please note that counsel for the Town cannot and will not provide creditors with any legal advice, including advice regarding how to vote on the Plan or the effect of confirmation of the Plan.

## II.    BACKGROUND INFORMATION

### A.    The Town

The Town is a municipal corporation and charter Town formed and organized under its charter and the Constitution of the State of California in 1984. The town is a general law city and has a council-manager style of government. Its governing body is a five-member Town Council. The Town is a destination resort community located in Mono County in the Eastern Sierra region of California. The Town's municipal boundary encompasses approximately twenty-four (24)

square miles; however, all but approximately four (4) square miles of this land are public lands administered by the United States Department of Agriculture Forest Service, Inyo National Forest.

The Town is a primary employment center of Mono County and generates the majority of the property and sales tax in the county.  The local economy is almost wholly dependent on recreation-based tourism and serves as a hub for access to an array of year-round outdoor recreational opportunities, including the Mammoth Mountain Ski Area,[3] the Devils Postpile National Monument, and the Inyo National Forest.  It is estimated that the Town receives approximately 1.3 million visitors in the winter and 1.5 million in the summer for an annual average of 2.8 million visits.  Approximately 8,200 people reside within the Town year-round.

**B.    Overview of the Town's Finances**

The Town has numerous funding sources, many of which are restricted in their use while others are available to pay for general government expenses, such as public safety, recreation programs, road maintenance, snow removal, and so on.   The chart below illustrates the breakdown of the Town's revenues for fiscal year ("FY") 2012-13 by funding type:



---

[3]     Mammoth Mountain Ski Area operates the Mammoth Mountain Ski Resort and Tamarack Cross Country Ski Center, is one of the largest employers in Mammoth Lakes, particularly during the winter months.

DOCUMENT PREPARED
ON RECYCLED PAPER

For FY 2012-13, the Town anticipates receiving approximately $36 million in revenue.[4] However, a large percentage of these funds are special revenues or are restricted by state or federal law in their use.  Of this $36 million, the Town only has discretion over the funds allocated to the General Fund Group (defined below) (the "General Fund Budget"), which ranged between approximately $16.4 and $19 million during the last three fiscal years and is estimated to be **approximately $16.5 million for FY 2012-13**.

The Town's revenues and expenditures are accounted for in various "funds," similar to bank accounts.  The largest fund of the Town is called the "General Fund," which is designated as fund #001.  While the Town uses very discreet fund numbers in its financial system, broader fund categories are used in the Town's annual audited financial statements.  The audit defines the funds over which the Town has discretion as the "General Funds Group."[5]

The General Fund Group is generally allocated unrestricted revenues, such as property taxes, sales taxes and transient occupancy taxes, which makes up the General Fund Budget. These revenues are spent on general government programs and services.  The General Fund also transfers money to the specific areas deemed high-priority for the Town, per the long-standing commitments made to the Town's voters by Town management to ensure voter support for past tax increases.

As noted above, the Town generally only has discretion over the General Fund Budget. The remainder of the Town's funds are characterized as either restricted, committed or assigned. For example, the Gas Tax fund accounts for State gas tax revenues, which can only be utilized for road repair and maintenance, snow removal, and similar expenses.  Similarly, any special tax revenues received by the Town are required by law to be spent for the specific purpose for which

---

[4]  For municipal accounting purposes, the Town's overall budget records reflect revenue of roughly $51.7 million.  However, approximately $15.6 million of this amount relates to inter-fund transfers between the Town's various funds and does not represent actual cash being received by the Town.  Thus, the Town anticipates receiving approximately $36 million in the coming year.

[5]  The General Funds Group includes the following funds:  001 General Fund, 008 Public Safety, 014 Tourism, 015 Parks &Recreation, 019 CDD, 020 Public Works Maintenance, 205 Public Works, 425 Transit, 465 Workforce Housing and 920 Comprehensive Leave.

they were levied.  With respect to general tax revenues, the Town has made certain non-binding political commitments as to how the funds would be used if certain tax measures are approved by the voters.  Such commitments have been helpful in securing support for the measures, and Town councils have been rigorous in adhering to those commitments over time.

## C.    The Town's Financial Problems

Beginning particularly in 2008, the Town struggled to balance its available revenues against its necessary expenditures.  Adverse economic conditions significantly affected the Town's primary revenue sources: property taxes, sales taxes, transient occupancy taxes, assessments and fees.  The crash of the housing market and the slowing economy decreased property and sales tax revenues, as well as other important revenue sources, such as motor vehicle licensing fees and real estate development fees.  Compounding these economic challenges, the Town - like all California cities - is limited by law in its ability to generate new revenues.

The Town took drastic steps in order to avoid insolvency.  For several years, the Town attempted to address its General Fund Budget deficits by reducing the number of its employees, cutting funding and services not controlled by contract, and severely reducing or completely cutting off funding for numerous community services, as well as infrastructure (such as street maintenance and vehicle replacement).  For example:

- In Fiscal Year 2009-2010: (i) the Town eliminated 17 positions, suspended essential technology replacements, and eliminated or reduced non-essential expenditures such as certain supply purchases; and (ii) employees agreed to a number of concessions such as deferral of scheduled pay increases, suspension of the contractually set 2-3% deferred compensation match by the Town, participating in bi-weekly unpaid furloughs, and suspension of holiday pay.

- In Fiscal Year 2010-2011: (i) the Town eliminated six - mostly management - positions, suspended Ice Rink operations, and used the available $577,000 debt reserve to fund one-time expenditures in planning; and (ii) employees agreed to a number of concessions such as another deferral of scheduled pay increases, continued suspension of the 2-3% deferred compensation match by the Town, and continuing unpaid furloughs.

- In Fiscal Year 2011-2012, the Town balanced a General Fund Budget Deficit of $2.7 million through some painful reductions, which included: (i) employee concessions saving $0.4 million; (ii) position eliminations saving $0.6 million; (iii) use of one-time money from non-General Fund sources to pay for one-time or limited duration expenses

DOCUMENT PREPARED
ON RECYCLED PAPER

within the General Fund, saving $0.8 million; (iv) using dedicated Measure A and Measure T funding to pay for General Fund expenses, saving $0.35 million; (v) reducing contractual spending to save $0.05 million; and (vi) reducing road repair and maintenance and other non-mandated spending, saving over $0.5 million.

In addition, although at least $1,500,000 is required annually to keep the Town's roads in their current condition, the Town cut its road repair budget down to $500,000 annually. The Town has deferred public vehicle replacement thereby increasing vehicle repair and maintenance costs, and increasing the risk of essential equipment failure. Simply stated, the Town is currently operating on a "bare bones" budget. Moreover, the Town has no funding set aside for maintenance, repair and improvements to its critical assets. Moreover, The Town's reserve levels are insufficient and have been largely depleted. The Government Finance Officers Association ("GFOA") recommends, "at a minimum, that general-purpose governments, regardless of size, maintain unrestricted fund balance in their general fund of no less than two months of regular general fund operating revenues or regular general fund operating expenditures." Due to the fluctuating nature of the Town's revenues (which are almost entirely dependent on tourism), the Town Council has adopted a policy to maintain a minimum reserve of 25% of the General Fund Budget; however, the Town's reserve at the end of fiscal year 2011-2012 was roughly 7%.

Combined, the cuts outlined above have had a dramatic negative impact on the quality of life of the Town's residents and impair the ability of the Town to maintain the level of service and maintenance of facilities necessary to continue to attract tourists, the foundation of the Town's economy.

### D.    The MMLA Judgment and Mandate Proceeding

In addition to the significant General Fund Budget deficits outlined above, the Town is also liable for a significant judgment in favor of MLLA. The Town, in 1997, entered into a agreement for the development and improvement of the infrastructure at the Mammoth Yosemite Airport through the construction of certain hotel and residential condominium units, retail, hangars and other structural improvements. The portion of the development agreement related to the construction of the hotel and residential condominium units was assigned by the Town's counterparty to MLLA. Litigation ensued and the hotel and residential condominium units at the

airport were never built.  In 2008, a jury found that the Town breached the portion of the development agreement associated with the construction the hotel and residential condominium units at the Mammoth Yosemite Airport and awarded $30 million in damages to MLLA. Subsequently, the trial court also awarded MLLA $2,361,130 in attorney's fees (collectively, the "MLLA Judgment").  On appeal from the Town, the California Court of Appeal for the Third Appellate District affirmed the judgment in December 2010, and on March 23, 2011, the California Supreme Court declined to hear the Town's appeal.  Thus, all of the Town's appellate remedies have been exhausted.  Due to the various appeals, post-judgment interest accruing at a statutory rate of 7%, and MLLA's attorneys' fees, the amount of the MLLA Judgment now exceeds $43 million – an amount that represents over 200% of the Town's yearly General Fund Budget.

Recognizing that the Town's resources were (and continue to be) clearly insufficient to pay the MLLA Judgment in full, on March 28, 2011 – a mere five days after the California Supreme Court declined to hear the Town's appeal – the Town and MLLA connected to establish a process to exchange information and begin settlement discussions.  Over the course of the next nine months, the Town provided MLLA voluminous information regarding, among other things, the Town's ability to pay the MLLA Judgment.

However, in January 2012, while the parties continued to negotiate and while the Town was in the midst of reviewing and revising its financial projections for the current and upcoming fiscal years, it became clear that, due to various macroeconomic pressures, a dry 2011/2012 winter season, and other specific challenges arising from retiree costs, health insurance, general liability and workers compensation insurance premiums, and compensation increases for the Town's workforce covered by collective bargaining agreements, the Town was in need of a global and comprehensive restructuring plan.  The Town notified MLLA of this need to effectuate a global restructuring plan on January 19, 2012, and informed MLLA that it anticipated presenting MLLA with a new settlement proposal in line with that draft restructuring plan.  For

that reason, the Town requested that the standstill period (the "Standstill Period") the parties had agreed to that was set to end on February 1, 2012, be extended.

Rather than agree to an extension of the Standstill Period and await the Town's global restructuring plan for further discussion, MLLA instead chose to file a petition with the Mono County Superior Court on February 2, 2012 (the day after the Standstill Period expired) seeking a writ of mandate demanding the Town to pay the full $43 million judgment.  On March 23, 2012, the Mono County Superior Court entered a writ of mandate (the "Writ") that commanded the Town to: "(i) immediately take steps to obtain funds to satisfy the judgment; (ii) include in all current and future budgets provision to provide funds in an amount sufficient to pay satisfy [sic] the judgment; and (iii) pay to the Hot Creek Developers the amount of $42,186,032.24, with additional interest accrued by law until the time of payment, by June 30, 2012, the end of the 2011-2012 fiscal year."  The Writ also provided that "[i]f the Town believes payment of this amount by the end of the 2011-12 fiscal year is an unreasonable hardship, the Town should move this Court for permission to pay the amounts owed in equal annual installments over the course of 10 years with the required interest under CAL. GOV'T CODE § 970.6."

### E.    The Neutral Evaluation Process

Recognizing that (i) settlement discussions with MLLA had come to an impasse due to the termination of the Standstill Period and MLLA's pre-emptive action in State Court seeking a Writ, and (ii) negotiations with all of the Town's major creditors would be necessary if the Town was going to implement a global restructuring plan, on February 15, 2012, the Town sent MLLA a letter notifying MLLA of the Town's intent to initiate the "neutral evaluation process" (the "Neutral Evaluation Process") established in section 53760 *et seq.* of the California Government Code ("AB 506").[6]  MLLA refused to participate in the Neutral Evaluation Process despite at least six requests by the Town for them to participate.

---

[6]    AB 506 (CAL. GOV'T CODE §§53760 *et seq.*), which establishes a "neutral evaluation process" (*i.e.*, mediation), was passed by the California Legislature last fall and became effective January 1, 2012.  Under AB 506, a local public entity may initiate the neutral evaluation process if the local public entity is or likely will become unable to meet its financial obligations as and when those obligations are due or become due and owing.  CAL. GOV'T CODE § 53760.3(a).

Notwithstanding MLLA's refusal to participate in the Neutral Evaluation Process, the Town still needed to reach agreement with its employees, vendors and trade creditors in order to address the significant $2.8 million projected budget deficit for FY 2012-13.  As a result, the Town proceeded with the Neutral Evaluation Process and, after a series of calls between the Town and its interested parties, and other calls among the various interested parties in which the Town did not participate (at their request), the Hon. David Coar, a former Bankruptcy Judge and Federal District Court Judge, was unanimously selected as the neutral evaluator on April 30, 2012.  Over the course of the next sixty days, the Town, the participating interested parties, and Judge Coar developed a framework within which certain aspects of the mediation could be made public, and engaged in a series of in-person and telephonic meetings to discuss a global restructuring plan.

As a result of those meetings and the good faith negotiations of all participating parties, the Town was able to develop a budget reduction plan (the "Budget Reduction Plan") to: (i) adjust the Town's expenditures and revenues through specific measures to balance the budget for the upcoming 2012-2013 fiscal year; (ii) create surplus funds to partially satisfy debts and obligations currently owed, including MLLA; and (iii) put the Town on a sustainable footing for future years.

### F.     The Filing of Bankruptcy

Although it had reached agreements with many of its creditors during the Neutral Evaluation Process, potentially resulting in significant concessions, nearly all were contingent on reaching an agreement with MLLA (which continued to refuse to participate in the Neutral Evaluation Process) or, failing such an agreement, the confirmation of a plan of debt adjustment. The Town's creditors and employees were willing to make these concessions as part of a global resolution of the Town's financial challenges.  But they were not willing to make concessions without reservation, if those concessions would not achieve the goal of allowing the Town to move forward with a global resolution.

On June 30, 2012, the Town was unable to pay MLLA either (i) $43 million, an amount equivalent to roughly twice its total General Fund Budget, or (ii) $4.3 million per year for the next 10 years (with interest).

On July 2, 2012, with the Town (i) unable to pay its debts when due despite its efforts to negotiate a settlement with all of its creditors, and (ii) generally not paying its debts as they become due, the Town Council authorized the Town to file a petition under chapter 9.

The Town filed its petition on July 3, 2012.

## III.    ADMINISTRATION OF THE TOWN'S CHAPTER 9 CASE

### A.    Budget Reduction Plan

In order to continue to fund municipal operations following the Petition Date, on July 1, 2012, the Town implemented the Budget Reduction Plan and unilaterally modified its financial obligations so as to balance General Fund expenditures with revenues during the course of the Chapter 9 Case.   This Budget Reduction Plan, among other things, reduced employees' compensation and made further reductions in services and expenditures.   This action enabled the Town to save the costs of certain collective bargaining agreement-mandated salary increases that were due in fiscal year 2012-13 (which began July 1, 2012).  The Town has continued to operate under the Budget Reduction Plan during the Chapter 9 Case.

### B.    Entry of Order for Relief

On [_____], 2012, the Bankruptcy Court issued its Eligibility Findings, holding that the Town met the chapter 9 eligibility criteria and, in particular, that the Town was insolvent.  On [_____], 2012, the Clerk of the Bankruptcy Court entered the order for relief, which recognized the Town as a debtor under chapter 9.

## IV.    THE TOWN'S LIABILITIES AND ASSETS

As noted above, the Financial Statements for the Town's fiscal year ending June 30, 2011 is not attached, but is available on-line or by written request.  This document provides all manner of information and financial data and includes the Town's independently audited financial

DOCUMENT PREPARED
ON RECYCLED PAPER

statements.  Set forth below is a summary of the material liabilities and assets that are relevant to the Plan.

A.    **Liabilities.**

1.    **Liabilities Listed by the Town in its Filings on the Petition Date.**

As required by Bankruptcy Code sections 924 and 925 and by Bankruptcy Rule 1007-1, the Town filed its list of creditors and claims (the "Creditors' List") [Docket No. ___].  The cover sheet to the Creditors' List disclosed as follows:

Summary of Obligations, Restricted and Unrestricted

| | Claim Count | % of Total | Total Claims | Total Current | % Current |
|---|---|---|---|---|---|
| Legal Claims/Judgments | 5 | 66.4% | $42,746,755 | $42,746,755 | 93.24% |
| Bond/COP/Long Term Debt | 7 | 20.4% | $13,105,070 | $1,474,383 | 3.22% |
| Insurance Cooperative | 1 | 3.7% | $2,412,471 | $993,635 | 2.17% |
| Pension/Retirement | 8 | 7.7% | $4,955,747 | $278,053 | 0.61% |
| Employment Related | 140 | 1.4% | $903,413 | $105,353 | 0.23% |
| Trade Debt | 522 | 0.1% | $74,247 | $74,247 | 0.16% |
| Contract | 24 | 0.1% | $67,465 | $67,465 | 0.15% |
| Leases | 7 | 0.1% | $66,693 | $66,693 | 0.15% |
| Taxes and Fees | 5 | 0.1% | $34,372 | $34,372 | 0.07% |
| Utilities | 8 | 0.0% | $3,200 | $3,200 | 0.01% |
| Bank Mastercard - Revolver | 1 | 0.0% | $1,136 | $1,136 | 0.00% |
| Union Contracts | 5 | 0.0% | $844 | $169 | 0.00% |
| Development Agreements | 10 | 0.0% * | | * | 0.00% |
| **Grand Total** | **743** | **100.0%** | **$64,371,413** | **$45,845,461** | **100.00%** |

*Additonal obligations may exist that are excluded because they are unliquidated, contingent, disputed or subject to offset*

2.    **Proofs of Claim.**

The Bankruptcy Court has established [_____], 2012 as the deadline for filing proofs of claim against the Town.   Approximately [___] proofs of claim have been filed to date, but, because the filing deadline has not yet occurred, it is likely that additional proofs of claim will be filed.   Notwithstanding, the Town has provided below good faith estimates of the anticipated amount of Claims for each Class of the Plan; however, these estimates may be materially lower or higher than the amount of Allowed Claims for each Class.

DOCUMENT PREPARED
ON RECYCLED PAPER

### 3. Class 6 Claims

The Class 6 Claims include, but are not limited to, Claims of (1) trade creditors, vendors, landlords and employees; (2) persons for, among other things, torts and civil rights violations; and (3) MLLA. By its analysis and calculations, the Town believes that the Allowed amount of Class 6 Claims will aggregate between approximately $43 million and $60 million.

The estimated Claims *greatly* exceed the value of the $5 million stream of payments and real property contributions from the Town for distribution to holders of Class 6 Claims. Based on the Town's estimation of the amount of Class 6 Claims, holders of Class 6 Claims would receive between 5% and 12% of their Allowed Class 6 Claim.

### 4. Claims Relating to the COPs Documents

#### a. Background

The Town has outstanding certificates of participation ("COPs") obligations which will be restructured through the Plan and through the various new instruments, described below, which will become effective on the Effective Date. In general, all of the COPs are financing agreements that follow the form of a lease out of Town-owned property to a Conduit Entity[7] and the simultaneous lease back of the same property to the Town by the Conduit Entity. In exchange, the Town receives a lump sum payment from the Conduit Entity which is funded by the issuance of the COPs. Periodic payments from the Town to the Conduit Entity are distributed to the holders of the COPs.

The payments are divided into "principal components" and "interest components." This is required in order for the interest components to be treated as tax-exempt under federal tax law. The sum of the principal components is referred to as the principal amount of the transaction. These COPs are structured in this way so that they comply with the so-called "lease exception" to the limitations on indebtedness in Article XVI, Section 18 of the California Constitution, as

---

[7] Either Mammoth Lakes Municipal Service Corporation or the Municipal Finance Corporation, each of which is a joint exercise of powers authority created for the purpose of assisting in financings (each a "Conduit Entity").

DOCUMENT PREPARED
ON RECYCLED PAPER

described in *Town of Los Angeles v. Offner,* 19 Cal. 2d 483 (1942) and *Dean v. Kuchel,* 35 Cal. 2d 444 (1950), the California Supreme Court cases that establish the lease exception.

**b.    Town's COPs Obligations**

*(i)    Union Bank COP Obligations*

The Union Bank COP Obligations consist of a single issuance of a series of COPs entered into in the year 2000 and structured as fixed interest rate obligations.  The COPs were sold to investors in a public offering and are still held by various investors.  Union Bank is the indenture trustee for the holders of these COPs.  The Union Bank COP Obligations were originally executed and delivered with an aggregate principal component of $2,470,000 of which $1,805,000 remains unpaid.  The final stated payment date of the Union Bank COP Obligations is in 2025.  The real property subject to the Union Bank COP Obligations consists of an approximately 16 acre parcel of undeveloped real estate currently zoned as park land.  The Town receives no net rental income from any of the properties.

*(ii)    Citizens Bank COP Obligations*

The Citizens Bank COPs consist of two separately issued COPs held solely by Citizens Bank consisting of: (a) the Citizens Bank (Police Facility) COP Obligations, originally executed and delivered with an aggregate principal component of $1,370,000 of which $317,713 remains unpaid; and (b) the Citizens Bank (Mammoth Lakes Housing Corporation Land Acquisition Project) COP Obligations, originally executed and delivered with an aggregate principal component of $422,750 of which $201,446 remains unpaid.  The real property subject to the Citizens Bank COPs consists of two parcels of real estate.  The Town receives no net rental income from any of the properties.

**5.    Statement Regarding Liabilities.**

The Town disputes a number of the Claims that have been asserted against it, and the Town's review and analysis of Claims is ongoing.  Given the inherent uncertainties in any litigation regarding claims, no assurance can be given regarding the successful outcome of any

litigation that may be initiated in objection to such claims or regarding the ultimate amount of unsecured claims that will be allowed against the Town.

As described below, the Plan enables the Town or the Trust, as applicable, to file objections to Claims at any time within 180 days after the Effective Date. The Plan also provides for the Town to retain any and all defenses, offset and recoupment rights, and counterclaims that may exist with respect to any disputed claim, whether under sections 502, 552, or 558 of the Bankruptcy Code or otherwise. The Town reserves all rights with respect to the allowance and disallowance of any and all claims. **In voting on the Plan, creditors may not rely on the absence of a reference in this Disclosure Statement or the Plan or the absence of an objection to their proof(s) of claim as any indication that the Town ultimately will not object to the amount, priority, security, or allowance of their claims.**

**B.     Assets.**

**1.     Capital Assets and Discretionary Assets.**

The Town owns numerous and varied capital assets, including buildings, roads, bridges, infrastructure and utility improvements, parks, undeveloped real property and service vehicles (such as snow removal trucks, police cars and street equipment). Virtually all of these municipal assets are used daily in the performance of public functions and cannot be easily liquidated (if at all) - particularly under current market conditions. They are valued in the Town's books and records at depreciated historical cost, which does not represent the cash value that could be recognized by the Town in the event of a voluntary sale. California law does not permit the levy on or sale of a Town's assets in order to satisfy a court judgment. Cal. Gov't Code § 900 *et seq.* Thus, the Town has not sought or obtained a valuation of its capital assets. Pursuant to the Financial Statements, as of June 30, 2011, the Town had total net assets (i.e., assets less liabilities) of approximately $82 million.

However, as noted above, the Town generally only has discretion with respect to the funds held in the General Fund Group and any unencumbered property not essential for municipal purposes. With respect to the General Fund Group, as of June 30, 2011, the fund balance totaled

$13,407,497.[8]  A majority of this balance ($10,094,618) is in a non-spendable form, representing payments expected to the General Fund Group from other sources, many of which may not be collected for a long time, if at all.  Of the spendable portion of these funds, a majority is committed or assigned.  Thus, the unassigned, uncommitted balance was only $423,817 as of June 30, 2011, and has since been expended, mainly to cover past-due public safety dispatch invoices and contractual transit costs.  The breakdown of the entire General Fund Group balance as of a year ago (the last audited year available) is set forth below:

---

[8]    Governmental accounting rules, and specifically, pronouncement number 54 of the Government Accounting Standards Board, or "GASB 54", require that fund balances be presented in the following categories:

- *Non-Spendable fund balances*: These are hard assets or other non-cash items that have value, such as roads, land and vehicles.

- *Restricted fund balances*: These are generally cash amounts constrained to specific purposes by their providers (such as grantors, bondholders, and higher levels of government), through constitutional provisions, or by enabling legislation.

- *Committed fund balances*: These are generally cash amounts constrained to specific purposes by the Town itself, through a Town Council action. To be reported as committed, amounts cannot be used for any other purpose unless the government takes the same highest-level action to remove or change the constraint.

- *Assigned fund balances*: These cash amounts are intended for a specific purpose; intent can be expressed by the Town Council or the Town Manager.

- *Unassigned fund balances*: These cash amounts that are available for any purpose. Unassigned balances can only be reported in the general fund.

In funds where spendable (restricted, committed, assigned and unassigned) balances exist, they function as reserves.  In some cases – mainly in the restricted sources – these reserves are mandated by law.  In other cases, the reserves are necessary to ensure that sufficient cash exists to pay expenses during the year.  The Town only has discretion with unrestricted fund balances; restricted funding must be spent in the specific areas established by applicable law.

DOCUMENT PREPARED
ON RECYCLED PAPER

```
General Fund Group - Fund Balance
As of June 30, 2011, per the audited financial statements

NON SPENDABLE:  Long Term Receivables
     Expected in fund 001: Airport Operational Loans 2001 through 2008     3,290,041 03
     Expected in fund 001: Airport Terminal Note                          1,698,005 73
     Expected in fund 001: Loan to DIF funds                              3,286,262 91
     Expected in fund 001: Equity in Employee housing assistance           272,212 00
     Expected in fund 001: Fractional Use Loan FY 2003-04 & FY 2004-05       89,785 70
     Expected in fund 015: Loans to the Mello Roos Fractional District      558,311 01
     Expected in fund 465: Loan for an affordable housing project           900,000 00
Subtotal                                                                10,094,618.38

COMMITTED:
     Reserve for Economic Uncertainty                                     1,408,271 12
     Self Insurance reserve                                                  15,000 00
     Fund 015-Parks & Rec                                                       600 00
     Fund 465: Workforce Housing                                            407,190 82
     Fund 920: Comprehensive Leave                                        1,057,999 72
Subtotal                                                                 2,889,061.66

UNASSIGNED:
     Fund 008 - Public Safety                                                93,303 43
     Fund 020 - Parks Maintenance                                               20 26
     Fund 014: Tourism                                                     (112,104 46)
     Fund 425: Transportation & Transit                                     442,597 57
Subtotal                                                                   423,816.80

Total General Fund-Fund Balance                                         13,407,496.84
```

With respect to unencumbered assets, the Town has almost no real property that is unencumbered or otherwise not used for essential municipal purposes.  The only real property owned by the Town that is not directly used for essential municipal operations or purposes are two condominium units, which are intended for use by the Town's workforce and are currently housing Town employees.  The Town is proposing to transfer these properties to the Trust to be sold in order to generate additional funds to help fund payments to holders of Class 6 Claims.

### 2.    Claims and Causes of Action Against Third Parties.

Parties in interest may not rely on the absence of a reference in this Disclosure Statement or in the Plan as any indication that the Town ultimately will not pursue any and all available claims, rights and causes of action against them.  **All parties who previously dealt with the Town hereby are on notice** that the Plan preserves all of the Town's rights, claims, causes of action, interests and defense unless otherwise specifically provided in the Plan.  The Town expects that any and all meritorious claims will be pursued and litigated after the Effective Date.

## V.    SUMMARY OF THE PLAN OF ADJUSTMENT

The discussion of the Plan set forth below is qualified in its entirety by reference to the more detailed provisions set forth in the Plan and its exhibits, the terms of which are controlling. Holders of Claims and other interested parties are urged to read the Plan and its exhibits, copies of which are attached to this Disclosure Statement as <u>Exhibit A</u>, in their entirety so that they may make an informed judgment regarding the Plan.

The Plan is premised upon the Long-Term Financial Forecast and Business Plan, which is the financial planning document adopted by the Town Council on June 20, 2012, that presents strategies for the Town to maintain a balanced operating budget, to address the Town's debts, to rebuild fiscal stability, and to enable the Town to continue to provide municipal services through June 30, 2017.  The Plan includes adjustment of the obligations owed in respect to the Citizens Bank (Police Facility) COP Obligations, the Citizens Bank (Mammoth Lakes Housing Corporation Land Acquisition Project) COP Obligations, the CJPIA General Liability Coverage Obligations and CJPIA Workers' Compensation Coverage Obligations, and proposes to pay these obligations from the General Fund.  The Plan also proposes to pay Convenience Class Claims and Employee Pre-Petition Leave Claims from the General Fund.

For the payment of Class 6 Claims, the Plan creates the Trust.  Holders of Allowed Class 6 Claims will receive a beneficial interest in the Trust in proportion to the amount of their Allowed Class 6 Claim as a percentage of the total Allowed Class 6 Claims.  The Town will fund the Trust by transferring the Contributed Real Estate, the Initial Cash Contribution on the Effective Date and, thereafter by contributing to the Trust, the Annual Cash Contributions and/or the net proceeds of a Plan COP/Bond.  The Trust Assets, aggregating approximately $6 million, will be liquidated and administered by a Plan Trustee for the beneficiaries of the Trust.  As assets are liquidated and the Trust funded, the Plan Trustee may make interim pro rata distributions to holders of Allowed Class 6 Claims, subject to the creation of Disputed Claims Reserves.  When (a) all Trust Assets are liquidated and the Trust has received all payments from the Town provided under the Plan and (b) the total of the Allowed Class 6 Claims has been determined, the

DOCUMENT PREPARED
ON RECYCLED PAPER

Plan Trustee will make a final pro rata distribution to holders of Allowed Class 6 Claims from the pool of assets held by the Trust in the Class 6 Claims Fund in full satisfaction of their Claims.

While those portions of the Five Year General Fund Business Plan that relate to the treatment of Claims under the Plan will be binding on the Town, creditors and parties in interest on the Effective Date, the sources and uses of funds during the next five years are projections and, as budgets are adopted during the next five years, undoubtedly may not exactly mirror those budgeted in the Five Year General Fund Business Plan.

On a going-forward basis, the Town will assume many of its pre-petition contractual obligations as indicated in Exhibit A per the terms of the Plan; executory contracts or unexpired leases not listed on Exhibit A to the Plan will be rejected. It will honor its pension contracts with CalPERS, meaning that pension benefits will not be altered. The Plan does not purport to bind the Town or its unions with respect to future collective bargaining agreements after the expiration of the negotiated memoranda of understanding ("MOUs").

Finally, and equally important, the Town will maintain the municipal services it provides to Town residents and businesses.

## A.    Classification and Treatment of Claims.

### 1.    Unclassified Claims.

Section II of the Plan governs the treatment of certain claims that are not classified into Classes under the Plan.

#### a.    Administrative Claims.

Administrative Claims are claims of the kind described in sections 503(b) and 507(a)(2) of the Bankruptcy Code. Section II(A) of the Plan provides for the treatment of Administrative Claims. Throughout the course of the Chapter 9 Case, the Town has endeavored to satisfy administrative expenses as they became due. Accordingly, the Town believes that most claims that otherwise would constitute Allowed Administrative Claims have been or will be satisfied in the ordinary course of business prior to and after the Effective Date.

DOCUMENT PREPARED
ON RECYCLED PAPER

The Plan provides that, except as provided in Section II(B) of the Plan, with respect to Professional Claims, or to the extent that the holder of an Allowed Administrative Claim agrees to a different treatment, the Town or its agent will pay to each holder of an Allowed Administrative Claim, in full satisfaction, release and discharge of such claim, cash in an amount equal to such Allowed Administrative Claim in the ordinary course of the Town's business, but in no event later than the later of the date that is practicable after (i) the Effective Date, or (ii) the date on which such claim becomes an Allowed Administrative Claim.

### b.    Professional Claims-

Professional Claims are claims of professionals for services and expenses in the Chapter 9 Case or incident to the Plan.

Section II(B) of the Plan provides that, pursuant to section 943(a)(3) of the Bankruptcy Code, all Professional Claims must be disclosed and be reasonable and that, upon being determined reasonable, the Town or the Disbursing Agent will pay to each holder of a Professional Claim, in full satisfaction, release and discharge of such Claim, cash in an amount equal to the unpaid portion of such Claim so determined.

The Town has paid the fees of its bankruptcy counsel, labor counsel and other professionals, on a regular basis during the Chapter 9 Case.  Pursuant to the requirements of the COPs documents, the Town also has reimbursed Union Bank and Citizens Bank for their professional fees.

Such fees are not subject to Bankruptcy Court review or approval, as Bankruptcy Code § 326 *et seq.* do not apply in chapter 9 cases, but must be reasonable.

### c.    Bar Date for Assertion of Requests for Payment of Administrative Claims (Other Than Ordinary Course Administrative Claims).

Section II(D) of the Plan provides that all requests for approval of Administrative Claims must be filed with the Bankruptcy Court and served upon the Town no later than thirty (30) days after the date on which the Notice of Effective Date is mailed pursuant to the Plan.

***Any request for payment of an Administrative Claim, and any request for a finding that a Professional Claim is reasonable, that is not timely filed by that deadline will be forever***

DOCUMENT PREPARED
ON RECYCLED PAPER

*barred, and holders of such claims will be barred from asserting such claims in any manner against the Town.*

### 2. Class 1 (Union Bank COP Obligations).

The Union Bank COPs were issued in June of 2000 and are held by numerous public holders. The Union Bank COP Obligations, representing, in the aggregate, the Claims held by the holders of the Union Bank COPs and Union Bank, Indenture Trustee, in Class 1 all of which are deemed Allowed under the Plan, will be unimpaired by the Plan. The Town shall pay Union Bank COP Obligations, including unpaid fees, expenses, and charges due to the trustee, when and in the amount due. All payments of Class 1 Claims will be made from the General Fund.

### 3. Class 2 (Citizens Bank (Police Facility) COP Obligations).

The Citizens Bank (Police Facility) COPs were issued in January of 2004 and are solely held by Citizens Bank. The Citizens Bank (Police Facility) COP Obligations, representing the Claims held by Citizens Bank in Class 2, which are deemed Allowed under the Plan, will be adjusted as described below.

Pursuant to the Plan, the Amended Citizens Bank COP Obligations Documents amending and restating the financing documentation underlying the Citizens Bank (Police Facility) COP Obligations will be executed on the Effective Date and the principal and interest components evidenced and represented by the documents underlying the Citizens Bank (Police Facility) COP Obligations will be adjusted to effect a three year extension of the term of the financing with no change to the current interest rate.

The annual payment obligations of the Town under the Amended Citizens Bank COP Obligations Documents for the Citizens Bank (Police Facility) COP Obligations shall be as set forth in the schedule attached as Exhibit C to the Plan. The Town shall pay to Citizens Bank any accrued but unpaid fees, expenses, and charges due under Citizens Bank (Police Facility) COP Obligations. All payments of Class 2 Claims will be made from the General Fund.

4.     **Class 3 (Citizens Bank (Mammoth Lakes Housing Corporation Land Acquisition Project) COP Obligations).**

The Citizens Bank (Mammoth Lakes Housing Corporation Land Acquisition Project) COPs were issued in January of 2004 and are solely held by Citizens Bank.  The Citizens Bank (Mammoth Lakes Housing Corporation Land Acquisition Project) COP Obligations, representing the Claims held by Citizens Bank in Class 3, which are deemed Allowed under the Plan, will be adjusted as described below.

Pursuant to the Plan, the Amended Citizens Bank COP Obligations Documents amending and restating the financing documentation underlying the Citizens Bank (Mammoth Lakes Housing Corporation Land Acquisition Project) COP Obligations will be executed on the Effective Date and the principal and interest components evidenced and represented by the documents underlying the Citizens Bank (Mammoth Lakes Housing Corporation Land Acquisition Project) COP Obligations will be adjusted to effect a three year extension of the term of the financing with no change to the current interest rate.

The annual payment obligations of the Town under the Amended Citizens Bank COP Obligations Documents for the Citizens Bank (Mammoth Lakes Housing Corporation Land Acquisition Project) COP Obligations shall be as set forth in the schedule attached as Exhibit D to the Plan.  The Town shall pay to Citizens Bank any accrued but unpaid fees, expenses, and charges due under Citizens Bank (Mammoth Lakes Housing Corporation Land Acquisition Project) COP Obligations.  All payments of Class 3 Claims will be made from the General Fund.

5.     **Class 4 (Employee Pre-Petition Leave Claims)**

Pursuant to the Plan, the number of hours of comprehensive and sick leave accrued but unpaid for each employee prior to July 1, 2012 (i.e., the hours in each employee's "Employee Pre-Petition Leave Bank") are reduced by 10%.  During their continued employment with the Town, Holders of a Class 4 Claim may use accrued and unpaid leave but will not be permitted to cash out (a) any hours in their Employee Pre-Petition Leave Bank or (b) any subsequently accruing but unpaid comprehensive or sick leave.  Class 4 Claims, after the reduction set forth above, will be paid from the General Fund as follows:

Upon the voluntary termination of employment of a Holder of a Class 4 Claim, hours in that employee's Employee Pre-Petition Leave Bank, shall be cashed out according to the following schedule:  (a) employees will receive a cash payment representing 50% of the total hours of his or her accrued and unpaid leave at the time of employment separation at the full rate of pay at the time of employment separation; and (b) the remaining 50% shall be paid out monthly over the following 12 months, at each employee's full rate of pay.  Upon the involuntary termination of employment of a Holder of a Class 4 Claim, hours in that employee's Employee Pre-Petition Leave Bank shall be cashed out as follows: employees will receive a cash payment representing 100% of their accrued and unpaid leave at the time of employment separation, at their full rate of pay.  Cash payments will be subject to all applicable payroll taxes and withholdings.

### 6.    Class 5 (Convenience Class Claims)

Class 5 consists of holders of general unsecured Claims whose Claims are not in Classes 1-4 or Classes 7-10 and are (a) in an amount equal to or less than $10,000 or (b) voluntarily reduced by the holder to $10,000.  Holders of Class 5 Claims will receive a cash payment of 10% of the Allowed amount of their Claim on the later of the Effective Date or the date the Claim is Allowed.  Payments to holders of Claims in this class will be made from the Town's General Fund.  Holders of Allowed Class 5 Claims will not receive beneficial interests in the Trust or participate in any distributions from the Class 6 Claims Fund.

Implementation of the Convenience Class will reduce the number of beneficiaries of the Trust and will simplify, streamline and reduce the costs of administration of the Trust and increase the potential payout to Class 6 Claims.

### 7.    Class 6 (General Unsecured Claims Not Otherwise Classified).

The Plan classifies most general unsecured claims in Class 6, and includes, without limitation, the Claims of MLLA and counterparties to executory contracts or unexpired leases rejected by the Town.  Holders of Allowed Class 6 Claims will receive pro rata beneficial interests in the Trust and will share pro rata in distributions from the Class 6 Claims Fund

maintained by the Trust and administered by the Plan Trustee.  The distributions will be made on the Payment Dates determined by the Plan Trustee pursuant to the Trust Agreement.  The Town estimates that payments to Class 6 Claims will be between 5-12% of the amount to Allowed Claim.

**8.**  **Class 7 (Claims of CJPIA for General Liability Coverage Obligations).**

The Town obtains its General Liability Coverage for tort or contract claims filed against it pursuant to the Government Claims Act through its membership in the California Joint Powers Insurance Authority (the "CJPIA") general liability pool.  To maintain its membership, the Town must make three different payments: (a) its annual contribution, (b) retroactive adjustment payments, determined annually, for prior coverage periods based on the final financial impact of claims against the Town, and (c) payments covering the Town's obligations under the CJPIA pooling agreement required as part of the CJPIA's recent transition from retrospective to prospective funding.

The Town will make the payments described in (a) and (b) above when and in the amounts due.  If it does not do so, the Town will lose its general liability coverage, exposing the Town to potentially much larger near-term claims.  However, holders of Class 7 Claims will receive the payments described in (c) above over a 10-year period rather than the required 6-year period.

**9.**  **Class 8 (Claims of CJPIA for Workers' Compensation Insurance).**

The Town obtains its Workers' Compensation Coverage for employee injury claims filed against it through its membership in a CJPIA workers' compensation pool.  To maintain its membership, the Town must make three different payments: (a) its annual contribution, (b) retroactive adjustment payments, determined annually, for prior coverage periods based on the final financial impact of claims against the Town, and (c) payments covering the Town's obligations under the CJPIA pooling agreement required as part of the CJPIA's recent transition from retrospective to prospective funding.

The Town will make the payments described in (a) and (b) above when and in the amounts due.  If it does not do so, the Town will lose its workers' compensation coverage, exposing the Town's current and former workers to grave risk and the Town to potentially much larger near-term claims.  However, holders of Class 8 Claims will receive the payments described in (c) above over a 10-year period rather than the required 6-year period.

10. **Class 9 (Claims of CalPERS with Respect to the CalPERS Pension Plan, as Trustee Under the CalPERS Pension Plan for the Benefit of CalPERS Pension Plan Participants).**

The Town will continue to honor its obligations under the CalPERS Pension Plan, CalPERS, as trustee, and the CalPERS Pension Plan Participants will retain all of their rights and remedies under applicable nonbankruptcy law.  Thus, CalPERS and the CalPERS Pension Plan Participants will be entitled to the same rights and benefits to which they are currently entitled under the CalPERS Pension Plan.

11. **Class 10 (Special Assessment and Special Tax Obligations).**

Special assessment and special tax revenues are legally restricted to the payment of debt service on the special assessment and special tax obligations, are "special revenues" as defined in section 902(2) of the Bankruptcy Code and cannot be used for any other purpose or be transferred to the General Fund or used to pay General Fund obligations. *See In re Town of Vallejo,* 408 B.R. 280 (B.A.P. 9th Cir. 2009).  The Town will continue to apply revenues from the applicable special assessments and special taxes to pay the Special Assessment and Special Tax Obligations as required by the terms of such obligations.  The Town has included Class 10 in the Plan in order to make it clear that Special Assessment and Special Tax Obligations are not obligations of the General Fund and cannot be and are not impaired under the Plan.

B. **Treatment of Executory Contracts and Unexpired Leases.**

1. **Generally.**

The Bankruptcy Code empowers debtors, subject to the approval of the Bankruptcy Court, to assume or reject their executory contracts and unexpired leases.  An "executory contract"

generally means a contract under which material performance other than the payment of money is due by the parties.

A debtor's assumption of an executory contract or unexpired lease means that it will and must continue to honor its obligations under such agreement. In other words, as to such agreement, it is business as usual. **As described in the next section, the Town will assume many of its executory contracts and unexpired leases.** Rejection of an executory contract or unexpired lease constitutes a prepetition breach of such agreement, excusing the debtor's future performance but creating a claim for the breach.

### 2.    Assumption.

The Town is a party to a number of executory contracts and unexpired leases. Significant agreements include its collective bargaining agreements with its four unions and its agreements with CalPERS relating to both pension benefits and healthcare. The Town has elected to assume such agreements as well as many of its other executory contracts and unexpired leases and will do so pursuant to the Plan or by a separately filed motion. The Town will not seek to assign any of the agreements that it assumes. The executory contracts or unexpired leases that the Town proposes to assume, including executory contracts or unexpired leases to be assumed as modified by agreement, are listed on Exhibit A to the Plan which will be filed as part of the Plan Supplement on or before the hearing to approve this Disclosure Statement, subject to amendment by the Town, at its sole discretion, through the conclusion of the Confirmation Hearing.

The Town believes that it is current in its payments and other obligations under the executory contracts and unexpired leases that it will assume. However, after the provision of notice and the opportunity for a hearing as part of the Assumption Objection Procedure provided in the Plan, the Bankruptcy Court will resolve any disputes regarding: (a) the amount of any cure payment to be made in connection with the assumption of any contract or lease; and (b) any other matter pertaining to such assumption and assignment. The Town retains the ability in its sole discretion to reject any executory contract or unexpired lease if the cure payment determined by

the Bankruptcy court in the Assumption Objection Procedure is higher than the Town has asserted in Exhibit A.

### 3.    Rejection.

The Plan will serve as the Town's motion, pursuant to section 365(a) of the Bankruptcy Code, to seek approval and authorization for the rejection of such executory contracts and unexpired leases that it does not elect to assume and has not already rejected pursuant to a separately filed motion.  Such agreements are those that the Town, in the exercise of its business judgment, deems burdensome.  All executory contracts and unexpired leases that are not are listed on Exhibit A to the Plan which will be filed as part of the Plan Supplement on or before the hearing to approve this Disclosure Statement, subject to amendment by the Town, at its sole discretion, through the conclusion of the Confirmation Hearing shall be deemed rejected on the Effective Dtae.

### 4.    Deadline for the Assertion of Rejection Damage Claims; Treatment of Rejection Damage Claims.

All proofs of claim on account of Claims arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court and served on the Town no later than 30 days after the later of (a) the Effective Date or (b) entry of an order of the Bankruptcy Court approving the rejection.  Any Claim for which a proof of Claim is not filed and served within such time will be forever barred and shall not be enforceable against the Town or its assets, properties, or interests in property.  Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be classified as Class 6 Claims and treated accordingly.

### C.    Means for Execution and Implementation of the Plan.

The Town will continue to operate under its Charter, governed by the Town Council, following the Effective Date.  It will continue to collect real property tax revenues, sales tax revenues, the user utility tax and other taxes following the Effective Date, spending such revenues on municipal services such as providing police protection, paving roads, facilitating the provision of funding for transportation services, housing and tourism promotion.  On June 20 2012, the

Town Council adopted the Long-Term Financial Forecast and Business Plan that provides the framework for sustainable operation of the Town through June 30, 2017 by allocating available unrestricted revenues among the Town's obligations. The Long-Term Financial Forecast and Business Plan balances the need to satisfy pre-bankruptcy debt with the Town's obligation to provide services to its residents and businesses. The Plan implements the Long-Term Financial Forecast and Business Plan, in part by creating the Trust, which will be funded with Trust Assets consisting of (a) the Initial Cash Contribution in the amount of approximately $1.6 million (b) the Annual Cash Contributions listed on Exhibit B to the Plan (or the net proceeds of a Plan COP/Bond the issuance of which is supported by that same stream of payments) which, together with the Initial Cash Contribution, will total approximately $5.8 million; and (b) the proceeds of the sale of Contributed Real Estate consisting of two condo units owned by the Town with a total approximate net value of $250,000. The assets of the Trust, held in a Class 6 Claims Fund, will be paid by the Plan Trustee to holders of Allowed Class 6 Claims pro rata according to the Allowed amounts of such claims. The Plan also includes concessions by Citizens Bank with respect to the treatment of the obligations to it under financing agreements with the Town, by employees with respect to accrued leave balances and by the CJPIA with respect to the treatment of the obligations to them under the general liability and workers' compensation pool agreements.

The Plan provides that the Town retains all of its Claims, causes of action, rights of recovery, rights of offset, recoupment rights to refunds and similar rights. Unless a Right of Action is expressly waived, relinquished, released, compromised or settled in the Plan, the Town expressly reserves all Rights of Action for later adjudication and, as a result, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Rights of Action upon or after the confirmation or consummation of the Plan or the Effective Date. In addition, the Town expressly reserves the right to pursue or adopt against any other entity any claims alleged in any lawsuit in which the Town is a defendant or an interested party.

### D.    Distributions.

The Town and the Trust may retain one or more agents to perform or assist it in performing the distributions to be made pursuant to the Plan, which agents may serve without bond.   The Town and the Trust may provide reasonable compensation to any such agent(s) without further notice or Bankruptcy Court approval.

All distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth in the books and records of the Town or the Trust, as applicable, or their respective agents, unless the Town or the Trust has been notified by such holder in a writing that contains an address for such holder different from the address reflected in its books and records. All such notifications of address changes and all address confirmations should be mailed to: Town of Mammoth Lakes, Attn: _____, or, if applicable, to the Trust, Attn: Plan Trustee _____.   All distributions to Union Bank, indenture trustee, shall be made in accordance with the documents underlying the Union COP Obligations; distributions to Citizens Bank shall be made in accordance with the Amended Citizens Bank COP Obligations Documents.

### 1.    Undeliverable Distributions.

If any distribution to any Claim holder is returned to the Town or the Trust or their agents as undeliverable, no further distributions shall be made to such holder unless and until the Town or the Trust, as applicable is notified in writing of such holder's then-current address.  Unless and until the Town or the Trust is so notified, such distribution shall be deemed to be "Unclaimed Property."

No later than 60 days after distributions are returned, the Town or the Trust, as applicable, will file with the Bankruptcy Court a list of Unclaimed Property, together with a schedule that identifies the name and last-known address of holders of the Unclaimed Property; the Town and the Trust otherwise will not be required to attempt to locate any such entity.  On the 60th day following the filing of the list of Unclaimed Property, the returned distributions and accrued interest or dividends earned thereon will be remitted to and vest in the Town or the Trust, as applicable.

DOCUMENT PREPARED
ON RECYCLED PAPER

## 2.     Timeliness of Payments.

Any payments or distributions to be made pursuant to the Plan shall be deemed to be timely made if made within 7 days after the dates specified in the Plan.   Whenever any distribution to be made under the Plan shall be due on a day that is a Saturday, Sunday, or legal holiday, such distribution instead shall be made, without interest, on the immediately succeeding day that is not a Saturday, Sunday, or legal holiday, but shall be deemed to have been made on the date due.

## 3.     Compliance With Tax, Withholding and Reporting Requirements.

The Town shall comply with all tax, withholding and reporting and like requirements imposed on it by any government unit, including without limitation, payments related to CalPERS required pension obligations, and all distributions pursuant to this Plan shall be subject to such withholding and reporting requirements.   In connection with each distribution with respect to which the filing of an information return (such as Internal Revenue Service Forms W-2, 1099 or 1042) or withholding is required, the Town shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law.   With respect to any entity from whom a tax identification number, certified tax identification number, or other tax information is required by law to avoid withholding has not been received by the Town, the Town at its sole option, may withhold the amount required and distribute the balance to such entity or decline to make such distribution until the information is received.

## 4.     Time Bar to Cash Payments.

Checks issued by the Town or the Trust on account of Allowed Claims will be null and void if not negotiated within 90 days from and after the date of issuance thereof.   Requests for reissuance of any check shall be made directly to the Town or the Trustee, as applicable, by the holder of the Allowed Claim with respect to which such check originally was issued.   Any claim in respect of such a voided check must be made on or before the first anniversary of the issuance

DOCUMENT PREPARED
ON RECYCLED PAPER

thereof.  After such date, all claims in respect of voided checks will be discharged and forever barred and the Town or the Trust, as applicable, will retain all moneys related thereto.

### 5.    No De Minimis Distributions.

Notwithstanding any other provision of the Plan, no payment of less than ten dollars will be made by the Town or the Trust on account of any allowed claim.

### 6.    No Distributions on Account of Disputed Claims.

No distributions shall be made on account of any part of any Disputed Claim until such Claim becomes Allowed (and then only to the extent so Allowed).  Distributions made after the Effective Date in respect of Claims that were not Allowed as of the Effective Date (but which later became Allowed) shall be deemed to have been made as of the Effective Date.

### 7.    No Postpetition Accrual of Interest.

Unless otherwise specifically provided in the Plan or allowed by order of the Bankruptcy Court, the Town and the Trust will not be required to pay to any holder of a claim any interest, penalty or late charge accruing with respect to such claim on or after the Petition Date.

### E.    Disputed Claims.

### 1.    Claims Objection Deadline; Prosecution of Objections.

The Town or the Plan Trustee will have the right to object to the allowance of claims filed with the Bankruptcy Court with respect to which liability or allowance is disputed in whole or in part.  Unless otherwise ordered by the Bankruptcy Court, the Town or the Trust must file and serve any such objections to claims by not later than 180 days after the Effective Date (or, in the case of claims lawfully filed after the Effective Date, by not later than 180 days after the date of filing of such claims).

### 2.    Reserves, Payments, and Distributions With Respect to Disputed Claims.

Prior to making *a pro rata* distribution to holders of Class 6 claims, the Plan Trustee shall reserve from the amount of the distribution a reserve for Class 6 Claims to the extent that such Claims are Disputed Claims.  The amount reserved for each such Claim shall be on the same *pro rata* basis as the distribution to Class 6, based upon the lesser of (a) the amount asserted by the

holder of the Claim to be owing, and (b) such amount as the Bankruptcy Court may estimate for all distribution purposes. Such reserves may be established and maintained by the Plan Trustee as accounting entries within the Class 6 Claims Fund maintained by the Trust.

At such time as a Disputed Claim becomes an Allowed Claim, in whole or in part, the Town or the Trust, as applicable, or their agents will distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan. Such distributions, if any, will be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim becomes a Final Order (or such other date as the claim becomes an Allowed Claim), but in no event more than 60 days thereafter. Unless otherwise specifically provided in the Plan or allowed by order of the Bankruptcy Court, no interest will be paid on Disputed Claims that later become Allowed Claims.

### F.    Continuing Jurisdiction of the Bankruptcy Court.

The Plan provides for the Bankruptcy Court to retain jurisdiction over a broad range of matters relating to the Chapter 9 Case, the Plan, and other related items. Readers are encouraged to review the Plan carefully to ascertain the nature of the Bankruptcy Court's continuing post-Effective Date jurisdiction.

## VI.    CONFIRMATION AND EFFECTIVENESS OF THE PLAN

**Because the law with respect to confirmation of a plan of adjustment is complex, creditors concerned with issues regarding confirmation of the Plan should consult with their own attorneys and financial advisors.** The following discussion is intended solely for the purpose of providing basic information concerning certain confirmation issues. The Town cannot and does not represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court may confirm the Plan. Some of the requirements discussed in this Disclosure Statement include acceptance of the Plan by the requisite number of creditors, and whether the Plan is in the "best interests" of creditors. These requirements, however, are not the only requirements for confirmation, and the Bankruptcy

Court will not confirm the Plan unless and until it determines that the Plan satisfies all applicable requirements, including requirements not referenced in this Disclosure Statement.

### A.      Voting and Right to Be Heard at Confirmation.

#### 1.      Who May Support or Object to Confirmation of the Plan?

Any party in interest may support or object to the confirmation of the Plan.  Even entities who may not have a right to vote (e.g., entities whose claims are classified into an unimpaired Class) may still have a right to support or object to confirmation of the Plan.  (*See* Section I(C)(2) for information regarding the applicable deadlines for objecting to confirmation of the Plan).

#### 2.      Who May Vote to Accept or Reject the Plan?

A creditor generally has a right to vote for or against the Plan if its Claim is both Allowed for purposes of voting and is classified into an impaired Class.  Generally, a Claim is deemed allowed if a proof of claim was timely filed, provided, however, that if an objection to a claim has been filed, the claimant cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or allows the claim for voting purposes.  Thus, **the definition of "Allowed Claim" used in the Plan for purpose of determining whether creditors are entitled to receive distributions is different from that used by the Bankruptcy Court to determine whether a particular claim is "allowed" for purposes of voting.  Holders of claims are advised to review the definitions of "Allowed," "Claim," and "Disputed" set forth in Section I(A) of the Plan to determine whether they may be entitled to receive distributions under the Plan.**

#### 3.      Who Is Not Entitled to Vote?

The holders of the following types of claims are not entitled to vote on the Plan: (a) Claims that have been disallowed; (b) Claims that are subject to a pending objection and which have not been allowed for voting purposes; (c) Claims that are not impaired; and (d) Administrative Claims, since such Claims are entitled to be paid in full once allowed.

### 4.    <u>Vote Necessary to Confirm the Plan.</u>

The Bankruptcy Court cannot confirm the Plan unless, among other things, (a) at least one impaired Class has accepted the Plan without counting the votes of any insiders within that Class; and (b) either all impaired Classes have voted to accept the Plan, or the Plan is eligible to be confirmed by "cram down" with respect to any dissenting impaired Class.

A Class of claims is considered to have accepted the Plan when more than one-half in number <u>and</u> at least two-thirds in dollar amount of the claims that actually voted in that Class have voted in favor of the Plan.

### B.    <u>The "Best Interests" Test.</u>

The Bankruptcy Court also must determine that the Plan is in the "best interests of creditors" pursuant to section 943(b)(7) of the Bankruptcy Code, which in the chapter 9 context means that treatment under the Plan must be better than the only alternative available, which is dismissal of the case.  Dismissal permits every creditor to fend for itself in the race to the courthouse, since a municipality such as the Town is not eligible under the Bankruptcy Code for a court-supervised liquidation under chapter 7.

The Town submits that the Plan is in the best interests of all creditors because significant payments will be made to all impaired Classes.  In contrast, in the absence of the financial adjustments contemplated by the Plan, the Town's creditors would be left to "fend for themselves."  And even the swiftest of creditors would likely find its ability to collect on a judgment stymied by the inability of the Town to pay without violating provisions of California law and by their inability to attach or execute of property of the Town.   In short, the Town cannot afford to pay its creditors absent the debt relief afforded by the Plan, and dismissal of the Chapter 9 Case could well result in chaos, with creditors receiving far less than proposed by the Plan.

### C.    <u>Feasibility.</u>

To satisfy the requirement set forth in Bankruptcy Code section 943(b)(7) that the Plan be feasible, the Town must demonstrate the ability to make the payments required under the Plan and still maintain its operations at the level that it deems necessary to the continued viability of the Town.  The Town submits that the Plan is feasible.  The financial underpinning of the Plan,

the Long-Term Financial Forecast and Business Plan, attached as Exhibit B, constitutes a sustainable matching of revenues and expenses, including the obligations created by or modified in the Plan.

### D.     **Cram Down.**

The Bankruptcy Code provides that the Bankruptcy Court may confirm a plan of adjustment that is not accepted by all impaired classes if at least one impaired Class of claims accepts the Plan and the so-called "cram down" provisions set forth in sections 1129(b)(l), (b)(2)(A) and (b)(2)(B) of the Bankruptcy Code are satisfied. The Plan may be confirmed under the cram down provisions if, in addition to satisfying the other requirements of section 943(b) of the Bankruptcy Code, it (a) is "fair and equitable", and (b) does not discriminate unfairly with respect to each Class of claims that is impaired under and has not accepted the Plan.

The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting unsecured Class of claims receives payment in full for its allowed claims, no holder of allowed claims in any Class junior to that Class may receive or retain any property on account of such claims. The "fair and equitable" standard also has been interpreted to prohibit any class senior to a dissenting Class from receiving more than 100% of its allowed claims under a plan. The Town believes that the Plan satisfies the "fair and equitable" standard because, among other things, no classes junior to the classes of unsecured claims are receiving or retaining any property under the Plan.

The requirement that the plan not "discriminate unfairly" means, among other things, that a dissenting Class must be treated substantially equally with respect to other Classes of equal rank. The Town does not believe that the Plan unfairly discriminates against any Class that may not accept or otherwise consent to the Plan.

**As noted above, the Town has reserved the right to request the Bankruptcy Court to confirm the Plan by "cram down" in accordance with sections 1129(b)(l), (b)(2)(a) and (b)(2)(b). The Town also has reserved the right to modify the Plan to the extent, if any, that**

confirmation of the Plan under sections 943 and 1129(b) of the Bankruptcy Code requires such modifications.

### E.    Effective Date.

#### 1.    Conditions to the Occurrence of the Effective Date.

The Plan will not become effective and operative unless and until the Effective Date occurs.  Section XIII of the Plan sets forth certain conditions to the occurrence of the Effective Date.  The Town may waive in whole or in part the condition regarding agreements and instruments contemplated by, or to be entered into pursuant to, the Plan.  Any such waiver of a condition may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

The Effective Date will occur on the first Business Day after which the conditions set forth in Section XIII of the Plan are satisfied or waived; *provided* that the Effective Date must occur by no later than six months after the Confirmation Date.

#### 2.    Non-Occurrence of Effective Date.

The Plan provides that, if confirmation occurs but the Effective Date does not occur within six months after the Confirmation Date, upon notification submitted by the Town to the Bankruptcy Court: (a) the Confirmation Order shall be vacated; (b) no distributions under this Plan shall be made; (c) the Town and all holders of Claims shall be restored to the *status quo* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (d) all of the Town's obligations with respect to the Claims shall remain unchanged, and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Town or any other entity or to prejudice in any manner the rights of the Town or any entity in any further proceedings involving the Town.  The failure of the Effective Date to occur, however, will not affect the validity of any order entered in the Chapter 9 Case other than the Confirmation Order.

### F.    Effect of Confirmation.

Confirmation of the Plan and the occurrence of the Effective Date will have a number of important and binding effects, some of which are summarized below.  Readers are encouraged to review Section XI of the Plan carefully and in its entirety to assess the various consequences of confirmation of the Plan.

### 1.    Discharge of the Town.

The rights afforded in this Plan and the treatment of all Claims by the Plan, be they Impaired or Unimpaired under this Plan, shall be in exchange for and in complete satisfaction, discharge and release of all Claims of any nature whatsoever arising on or before the Effective Date, known or unknown, including any interest accrued or expenses incurred thereon from and after the Petition Date, whether against the Town or any of its properties, assets or interests in property. Except as otherwise provided herein, upon the Effective Date, all Claims against the Town that arose prior to the Effective Date shall be, and shall be deemed to be, satisfied, discharged and released in full, be they Impaired or Unimpaired under this Plan.

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, (a) the Town and its property are discharged and released from all Claims and rights that arose before the Effective Date, including all debts, obligations, demands, and liabilities, and all debts of the kind specified in Bankruptcy Code section 502(g), 502(h), or 502(i), regardless whether (i) a proof of Claim based on such debt is filed or deemed filed, (ii) a Claim based on such debt is allowed pursuant to Bankruptcy Code section 502, or (iii) the holder of a Claim based on such debt has or has not accepted the Plan; (b) any judgment underlying a Claim discharged hereunder is void; and (c) all Persons are precluded from asserting against the Town or its property any Claims or rights based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

### 2.    Exculpation

Section XI.A. of the Plan provides that, subject to certain limitations, the Town and its Related Parties shall not have or incur any liability to any Person for any act or omission occurring on or after the Petition Date in connection with, related to, or arising out of the Chapter

DOCUMENT PREPARED
ON RECYCLED PAPER

9 Case, the formulation, preparation, dissemination, implementation, confirmation, or approval of the Plan or any compromises or settlement contained therein, the Disclosure Statement, or any contract, instrument, release, or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan.

### 3.    **Binding Effect**

Upon the Effective Date and pursuant to Bankruptcy Code section 944(a), the Plan and the distributions and treatments provided in the Plan shall be binding upon the Town, all holders of Claims, parties in interest, and other Persons.  Confirmation of the Plan binds each holder of a Claim to all the terms and conditions of the Plan, whether or not such holder is in an impaired class under the Plan and whether or not such holder has accepted the Plan.

### 4.    **Injunction**

The Plan provides that all entities who have held, hold or may hold a claim against the Town that is based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, that otherwise arose or accrued prior to the Effective Date, or that otherwise is discharged pursuant to the Plan shall be permanently enjoined from and after the Effective Date, from: (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such claim against the Town or its property; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order against the Town or its property with respect to such claim; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against the Town or its property; (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to the Town with respect to any such claim, except as otherwise permitted by section 553 of the Bankruptcy Code; and (e) commencing or continuing any action, any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan, the Confirmation Order, or the discharge provisions of Bankruptcy Code section 944.

DOCUMENT PREPARED
ON RECYCLED PAPER

5.     **Term of Existing Injunctions and Stays.**

The Plan provides that all injunctions or stays provided for in the Chapter 9 Case pursuant to sections 105, 362, or 922 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date.

## VII.   CERTAIN RISK FACTORS TO BE CONSIDERED

Confirmation of the Plan and the occurrence of the Effective Date are not without risk to the Town and its creditors in that the sources of revenue projected in the Long-Term Financial Forecast and Business Plan could contract.  Thus, while the Town devoted considerable time and effort in formulating the Long-Term Financial Forecast and Business Plan, there can be no guaranty that it will be 100% accurate.  For example, few California cities, if any, predicted the length and depth of the economic downturn that saw real property values (and thus real property tax revenues) plummet.  Nor did Town financial planners predict the reduction in revenue from tourism caused in general by the economic downturn and more specifically by the recent low snowfall levels which reduced the amount of sales tax revenues and TOT revenue.  Conversely, while the General Fund expenditures projected in the Long-Term Financial Forecast and Business Plan are the Town's best and most reasoned estimate of costs, the occurrence of a natural or human-caused disaster could and likely would cause costs to rise, if not to spike.  These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

**The Town submits, though, that the risk to creditors and parties in interest is greater if the Plan is not confirmed and consummated than if it is.**

## VIII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The implementation of the Plan may have federal, state, local and foreign tax consequences to the Town and its creditors.  No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan.  However, because the Town is a municipal corporation duly organized and existing under its Charter and the Constitution of the State of California, and is treated as a political subdivision of the State of California for federal income tax purposes, the Town believes that it will not be subject to any federal income tax liability from

DOCUMENT PREPARED
ON RECYCLED PAPER

implementation of the Plan.  The Town anticipates that, in conformity with past practice, it will not file any federal corporate income tax returns with respect to the periods in which the Plan is implemented nor report any income for federal income tax purposes as a result of implementing the Plan.

Because individual circumstances may differ, and the income tax consequence of a chapter 9 case are complex and uncertain, this summary does not address the federal income tax consequences that may be relevant to the creditors of the Town as a result of the Plan.  Accordingly, the creditors should consult with their own tax advisors regarding the income tax consequences of the Plan to them, including the effect, if any, the Plan may have on prior outstanding obligations the interest components of which the creditors were treating as excludable from gross income for federal income tax purposes.

**To ensure compliance with requirements imposed by the Internal Revenue Service, you are hereby notified that any tax advice contained in this summary is not intended or written to be used by any taxpayer, and cannot be used by any taxpayer, for the purpose of avoiding tax-related penalties that otherwise may be imposed under the Internal Revenue Code on the taxpayer.  Such advice was written in connection with the solicitation of votes in favor of the Plan.  Creditors should seek tax advice regarding the tax consequences to them of the Plan based on their particular circumstances from an independent tax advisor.**

IX.    **RECOMMENDATION AND CONCLUSION**

The Town believes that confirmation and implementation of the Plan is preferable to all other available and feasible alternatives.   Accordingly, **the Town urges holders of impaired claims to vote to accept the Plan by so indicating on their ballots and returning them as specified in this Disclosure Statement and on their ballots.**

DATED: July 3, 2012                                    TOWN OF MAMMOTH LAKES,
                                                                              CALIFORNIA


By: _____
            David Wilbrecht
            Town Manager

Submitted By:

**FULBRIGHT & JAWORSKI L.L.P.**
Zack A. Clement (*pro hac vice* pending)
William R. Greendyke (pro hac vice pending)
R. Andrew Black (*pro hac vice* pending)

-and-

_____
**KLEE, TUCHIN, BOGDANOFF & STERN
LLP**
Kenneth N. Klee (SBN 63372)
Michael L. Tuchin (SBN 150375)

Attorneys for Debtor
Town of Mammoth Lakes, California

**EXHIBITS TO DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN FOR THE ADJUSTMENT OF DEBTS OF TOWN OF MAMMOTH LAKES, CALIFORNIA.**

Any exhibits not attached will be provided as part of the Plan Supplement

Exhibit A     Plan for the Adjustment of Debts of Town of Mammoth Lakes, California, Dated July 3, 2012

Exhibit B     Financial Statements from Long-Term Financial Forecast and Business Plan

DOCUMENT PREPARED
ON RECYCLED PAPER